IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BROOKLYN GRIFFITH, | : | |
| 603 Worthington Forest Pl. | : | |
| Columbus, Ohio 43229, | : | CIVIL ACTION NO. |
| | : | |
| Plaintiff, | : | |
| | : | JUDGE |
| v. | : | |
| | : | MAGISTRATE JUDGE |
| MIFFLIN TOWNSHIP, | : | |
| 400 W. Johnstown Rd., Suite 200 | : | |
| Gahanna, OH 43230, | : | **JURY DEMAND ENDORSED HEREON** |
| | : | |
| Defendant. | : | |

**COMPLAINT**

**I.     Preliminary Statement**

1.     This action seeks economic, compensatory, and punitive damages; declaratory, injunctive, and equitable relief; prejudgment and post-judgment interest; and attorneys' fees and costs for the violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.*; and the Ohio Laws Against Discrimination, R.C. Ch. 4112, committed by Defendant when it (1) discriminated against Plaintiff based on her sex in terminating her for pretextual reasons while retaining similarly situated male co-workers who were not so terminated and/or disciplined for the same, similar, and/or worse conduct; (2) retaliated against Plaintiff in terminating her for engaging in protected activity when she complained of and/or opposed in a responsible and non-disruptive manner employment practices she reasonably and sincerely believed constituted sex discrimination, sex stereotyping, and/or sex-discriminatory severe or pervasive harassment leading to a hostile work environment based on sex by Defendant, its male officers, and/or its superior officers; and/or (3) failing to remedy severe or pervasive conduct and/or harassment leading to a hostile work environment based on sex after being reasonably put on notice of such

1

conduct by Plaintiff's repeated good faith complaints of severe or pervasive harassment based on sex and failing to and/or declining to take responsive action.

## II. Jurisdiction and Venue

2. Plaintiff brings sex discrimination, retaliation, and sex-based hostile work environment claims under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq*. and the Ohio Laws Against Discrimination, R.C. 4112.99.

3. This Court has jurisdiction by virtue of 28 U.S.C. §§ 1331 (federal question); 1343 (civil rights); and 1367 (supplemental jurisdiction).

4. Based on a timely-filed charge affidavit, Plaintiff received a Right-to-Sue Letter from the Equal Employment Opportunity Commission on or around March 10, 2022, which was Amended and reissued because the first was sent due to administrative error, on March 22, 2022, less than 90 days ago (a true and accurate copy of which is attached hereto as Exhibit A).

5. Declaratory, injunctive, and equitable relief, including reinstatement, are sought pursuant to 28 U.S.C. §§ 2201; 2202, and the common law of the State of Ohio.

6. Compensatory and punitive damages may be awarded under Title VII; R.C. 4112.99; and the common law of the State of Ohio.

7. Costs and attorneys' fees may be awarded pursuant to the 42 U.S.C. § 1988; Title VII, 42 U.S.C. § 2000e-5(k); Fed. R. Civ. P. 54; and the common law of the State of Ohio.

8. Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) and S.D. Civ. R. 82.1 because the claims arose in and around Franklin County, Ohio, where Defendant Mifflin Township locates its Police Department Headquarters, conducts its operations, and employed Plaintiff at all times material to this Complaint.

## III. Parties

9. Plaintiff Brooklyn Griffith is a female resident of Franklin County, Ohio; was employed by Defendant Mifflin Township in a W-2 position as a Probationary Police Officer for approximately 1 year; where she earned an annual base salary of $45k per year and generous opportunities for overtime and special duty pay in addition to public employee benefits.

10. Defendant Mifflin Township is a political subdivision of the State of Ohio pursuant to Chapter 2744 of the Ohio Revised Code; employs, on a daily basis each week, more than 20 employees; and, at all times material to this Complaint, acted under color of state law; employed Plaintiff as a Probationary Police Officer in a W-2 capacity; and subjected her to sex discrimination, retaliation for engaging in protected activity, and/or failed to remedy severe or pervasive conduct leading to a hostile work environment based on sex upon reasonable notice.

## IV. Facts

11. On May 10, 2019, Ms. Griffith was hired as a Probationary Police Officer by Defendant Mifflin Township in its Police Department.

12. Prior to joining Defendant's police force, Ms. Griffith was trained as a Cadet at the Columbus State Police Academy from 2016-2017, where she received joint training by and at the Columbus Police Academy, exceled in her courses, earned a designation for top physical fitness performance amongst the female cadets, and was well-reviewed by her commanders.

13. Upon graduation from the Academy, Ms. Griffith was hired as a Probationary Police Officer at Blendon Township in its Police Department, where she received accolades for her performance in her reviews and gained relevant law enforcement experience and training in the field.

14. Ms. Griffith decided to apply to Defendant Mifflin Township's Police Department after she experienced forms of sex-based harassment in her previous job, for which she complained of to her then-superiors which ultimately did not result in favorable remedial action.

15. Ms. Griffith later explained the harassment issue she was experiencing at Blendon Township to Defendant Mifflin Township's then-Lieutenant, Tammy Phillips ("Lt. Phillips"), after a mutual contact connected her with Lt. Phillips for a potential job opportunity with Defendant's police force.

16. In or around May 2019, after Ms. Griffith applied to an open Probationary Police Officer position with Defendant but prior to being hired, Lt. Phillips advised her that it would be in her best interests to withdraw her harassment complaint against Blendon Township and warned her that if she pursued an employment lawsuit against Blendon Township, then Defendant Mifflin Township would not hire her, nor would any other police department for that matter.

17. Because Ms. Griffith dreamed of being a police officer, she followed Lt. Phillips' advice in declining to pursue her complaint against Blendon Township any further and resigned from its employ to begin her position with Defendant on May 10, 2019.

18. However, beginning as early as she started with Defendant, Ms. Griffith's male co-workers, including male superiors, routinely commented, on a near-daily basis, that they disliked – even "hated" – women in law enforcement, referenced a "female mentality" in women officers that often lead to mistakes, denigrated Defendant's former female Officer before Ms. Griffith as "useless" because she was a woman, and expressed the belief that women "did not belong" in the law enforcement field in general.

19. Despite these near-daily negative sex-discriminatory comments towards women in law enforcement, Ms. Griffith maintained her professionalism and was performing well in her role as a Probationary Officer, receiving positive feedback from her peers and superior officers, including Lt. Phillips.

4

20. On several occasions during her tenure with Defendant, Ms. Griffith complained about and/or opposed these severe or pervasive negative sex-discriminatory comments towards women and/or herself as a woman to Lt. Phillips and other superior officers; however, on each occasion, she received general, dismissive responses, such as calling her "too sensitive," telling her to "get over it," and/or denials of such comment occurring, such as, "it's not like that."

21. When Probationary Officers have been employed for six months, Defendant has each officer fill out a six-month self-review of their performance.

22. Ms. Griffith's six-month self-review noted her perceived strengths and areas where she believed she could improve in her role, displaying professional growth and meaningful self-reflection.

23. Ms. Griffith continued to receive positive feedback and advice from her superiors, including Lt. Phillips, throughout her probationary period and was often called in to pick up additional shifts due to her reliability.

24. Notably, during her time with Defendant, Ms. Griffith only received one documented formal disciplinary write-up for an alleged violation of Defendant's general standard of conduct policy involving a private Facebook post Ms. Griffith made on October 13, 2019.

25. The subject post was on a private (admitted members-only) Facebook peer support group created and run by a community-based and/or non-profit advocacy group, National Female Public Safety Protection ("NFPSP"), specifically for female law enforcement officers to seek advice and support from each other as women in law enforcement.

26. By virtue of the group's strict privacy settings, only members admitted to the group by an administrator could access its content, which at the time, totaled less than 1.7k members.

Moreover, administrators do not admit any new members to the group unless a prospective member can verify to the administrator that she is in fact a law enforcement officer.

27. The first "group rule" appearing on the private NFPSP female law enforcement peer support Facebook group's member request page states "[n]othing posted in this group is spread outside of this group. If you do, you will be blocked and banned from this group".

28. Ms. Griffith's private Facebook post to this NFPSP group, available only to other female law enforcement officers, detailed perceived issues she was experiencing with another female officer from a different police department who would travel outside of her own jurisdiction for no apparent reason other than to socialize with Ms. Griffith's male peers during crime scene processing.

29. In short, Ms. Griffith explained in the post how she believed the outside female officer was disrupting Ms. Griffith's and her peers' ability to work efficiently by essentially stopping by to hang out rather than assist with the work at hand, noted that her male peers were of no help in preventing the issue and actually exacerbated it because they openly discussed that they found the other officer attractive, and sought advice on how to amicably resolve her concerns and prevent the unprofessional disturbances from occurring in the future.

30. Shortly before making the post, in addition to her complaints about severe or pervasive sex-discriminatory harassment in the workplace, Ms. Griffith informed Lt. Phillips about this outside female officer disrupting crime scenes in Defendant's jurisdiction to hang out with her male peers and explained that they were no help because all they would do is talk about how attractive they found the other officer.

31. Ms. Griffith specifically mentioned to Lt. Phillips at that time that one of the male Field Training Officers ("FTO Petticord") excused this type of conduct to her in response to similar

6

concerns she had brought to his attention by stating, "[g]uys have lizard brains and just want to fuck things." She complained to Lt. Phillips that FTO Petticord's comment and similar remarks by male officers were offensive.

32. At the time, Lt. Phillips merely stated that she was sorry that Ms. Griffith had been offended and offered no other advice or action in response to these concerns, which lead Ms. Griffith to seek additional advice and support from other women in law enforcement through the private Facebook group set up by NFPSP.

33. On October 18, 2019, Ms. Griffith was written up because of this private Facebook post, which was reported to Lt. Phillips by a third-party female officer from another department, who then forwarded a screenshot of the post to Defendant's then-Chief of Police, William Price ("Chief Price").

34. At the time, Defendant maintained no specific policy regarding social media and Lt. Phillips and Chief Price informed Ms. Griffith in issuing her disciplinary write-up that there was "technically" no specific policy addressing her social media activity, but they were writing up her up anyways for perceived "unprofessional and inappropriate" remarks contained in the post that allegedly violated Defendant's general standards of officer conduct policy.

35. In response to this write-up for her social media post, Ms. Griffith told Lt. Phillips and Chief Price that she believed her male coworkers were treating her differently and targeting her as the only full-time female officer in Defendant's Police Department.

36. Ms. Griffith elaborated that her male peers and superiors disliked her and treated her differently than Defendant's male officers and some other female officers outside of the Department because she did not conform to sex-based stereotypes that women should be flirtatious

and instead made it clear that she was not interested in engaging in any flirtatious behavior with them in favor of maintaining professional working relationships.

37. Ms. Griffith stated that she routinely experienced a lack of general support in her role from male officers and that the private NFPSP Facebook peer support group, consisting of all female law enforcement officers, had been the only source of support for her as a woman in law enforcement.

38. Ms. Griffith again explained how her male peers openly made unprofessional and sexually inappropriate remarks about the subject female officer of her post; specifically, that they found her "hot" and "wanted to fuck" her. She informed Lt. Phillips and Chief Price that she heard at least two male officers make these specific comments while on duty and in uniform.

39. Neither Lt. Phillips nor Chief Price investigated and/or took any other remedial action in response to Ms. Griffith's complaints of sex discrimination, sex-based severe or pervasive conduct, and sex-based stereotyping.

40. Instead, Lt. Phillips and Chief Price invalidated and/or deflected Ms. Griffith's concerns and ultimately redirected the conversation back to why they believed her remarks in the social media post warranted the written discipline meted out to her.

41. The only other documented corrective action Ms. Griffith received during her tenure with Defendant occurred on November 6, 2019, in the form of a verbal warning from Lt. Phillips when Ms. Griffith accidentally scraped the side of a police cruiser while parking it on October 31, 2019, an incident which Ms. Griffith promptly and properly documented and reported.

42. On January 20, 2020, Ms. Griffith was assigned to a dispatch call with a male officer from Clinton Township Police Department involving an apparent domestic violence case.

43. Once on scene, Ms. Griffith realized that an arrest needed to be made based on the facts presented, law, and policy; however, the male officer did not want to arrest the subject and insisted that they just separate the parties instead. Ultimately, the male officer instructed Ms. Griffith to "sit out" while he took the subject home.

44. Ms. Griffith reported the Clinton Township Officer's improper response to Lt. Phillips and explained why the situation needed to be handled as a domestic violence arrest case.

45. Lt. Phillips largely agreed with Ms. Griffith's assessment of the facts and confirmed to Ms. Griffith that if it was later determined an arrest was necessary in that instance and the suspect ended up harming the victim when he should have been arrested the first time, Ms. Griffith and the male officer could be charged with dereliction of duty.

46. Despite the potential risk of such an outcome, Lt. Phillips cautioned Ms. Griffith that, as an assisting officer on the scene, she should defer to the Clinton Township officer even if his assessment turned out to be incorrect because he had jurisdiction over the scene.

47. Ms. Griffith remained concerned after speaking with Lt. Phillips on the potential for a dereliction of duty charge, and she then informed the male officer's Sergeant at Clinton Township, who stated an investigation into the matter would be launched against the male officer.

48. Lt. Phillips later learned that Ms. Griffith reported the incident to Clinton Township and arranged a meeting between herself, Chief Price, and Ms. Griffith where they characterized Ms. Griffith's report to Clinton Township as stepping "outside the chain of command".

49. During that meeting, Ms. Griffith expressed that she believed her male peers and superior officers, including those with Defendant Mifflin Township and the male officer from Clinton Township, "treated her differently because she was a girl."

9

50. Chief Price and Lt. Phillips denied that anyone would treat her differently for that reason, and Ms. Griffith responded that she observed all the other officers, who were men, do a lot worse things than her and not be disciplined by Defendant, whereas she had been disciplined for the social media post and was apparently being disciplined during this meeting for reporting a potentially dangerous failure to arrest situation.

51. Chief Price responded that he had heard from another officer and/or officers that Ms. Griffith had, at some point, improperly accused at least some of her male colleagues of being "cheaters," to which she responded that several of Defendant's male officers had in fact characterized themselves in that way.

52. Ms. Griffith further explained that Defendant's male officers often made her uncomfortable by routinely and openly discussing sexually inappropriate topics in her presence while on duty, including sexual activities, wanting to "fuck" other female officers and/or citizens encountered on their runs (including a waitress at a restaurant where they frequented), and cheating on their significant others. Ms. Griffith again specifically referenced FTO Petticord's purported explanation to her regarding these types of conversations, that "[g]uys have lizard brains and just want to fuck things."

53. Lt. Phillips chimed in that she recalled Ms. Griffith bringing up these same comments to her previously.

54. Ms. Griffith also referenced a recent example of egregious conduct by a male probationary officer, Seth Pinney, who was not reported and/or disciplined by superior male officers who became aware that he engaged in a sexual relationship with a female criminal defendant whom he had arrested and/or cited on the scene of a fatal crash after issuing the charges against her.

55. Then-Probationary Officer Pinney ("P.O. Pinney") had also shown that defendant's nude pictures to several of his co-workers and superior officers, for which he was later reported to Lt. Phillips by one of Defendant's part-time probationary officers, Cheyenne Hughes (female; "P.O. Hughes").

56. In referencing this egregious conduct as differential treatment based on sex, Ms. Griffith pointed out that P.O. Pinney had not been reported by or otherwise disciplined by FTO Petticord and Sergeant Hardway (both male), who were both present when he admitted to the relationship and showed the defendant's nudes directly to them and P.O. Hughes.

57. Ms. Griffith further questioned why neither of the male superiors were disciplined and why P.O. Pinney had been permitted to resign in December 2019 in good standing with no documentation of this inappropriate conduct in his file, likening these as examples of male officers being permitted to "get away" with egregious conduct whereas she had been reported and/or disciplined for lesser conduct, such as her Facebook post and reporting the Clinton Township officer's failure to arrest a domestic violence suspect.

58. Lt. Phillips simply stated that P.O. Pinney was "young," as if that excused his behavior, noted that it seemed like "tensions were high", and asked Ms. Griffith if she wanted to take a few days off.

59. Ms. Griffith responded that she did not need any time off and that she believed she had not done anything near as egregious as the examples referenced that would warrant discipline.

60. Lt. Phillips and Chief Price did not ask any additional questions or otherwise investigate Ms. Griffith's good faith complaints regarding sex discrimination, sex stereotyping, and/or sex-discriminatory severe or pervasive harassment leading to a hostile work environment based on sex by Defendant, its male officers, and/or its superior officers.

61. This incident and subsequent meeting were ultimately not documented and/or retained in Ms. Griffith's file.

62. On April 20, 2020, Ms. Griffith was informed by Lt. Phillips that a male coworker complained about Ms. Griffith's hair being down in the station while at her desk.

63. Ms. Griffith reiterated that she believed her male co-workers and superiors did not like her, failed to support her because they did not respect woman in law enforcement, that they made disparaging comments about women in law enforcement on multiple occasions, and that they were targeting her for discipline "because she is a girl."

64. Lt. Phillips responded that she did not think that it was true that anyone was targeting her or otherwise lacked respect for women in law enforcement but expressed matter-of-factly that "things were going to be harder" for Ms. Griffith because she was a woman and instructed her not to "give [the male officers] any reasons hem [her] up".

65. Ms. Griffith said, "[s]o I have to just deal with it?"

66. Lt. Phillips repeated that Ms. Griffith needed to "watch herself" and keep her head down.

67. Ms. Griffith expressed that it did not make sense for her to be the one to have to tread carefully when it was others who elected to treat her differently.

68. Lt. Phillips did not further investigate or otherwise take any remedial actions in response to Ms. Griffith's complaints of sex discrimination, sex stereotyping, and/or sex-discriminatory severe or pervasive harassment leading to a hostile work environment based on sex by Defendant, its male officers, and/or its superior officers.

69. On April 29, 2020, Ms. Griffith posted a video while off-duty on her personal social media account ("TikTok") where she was off-duty and in uniform.

70. Ms. Griffith and several of her similarly situated male co-workers, including P.O. Pinney and others, and even superior officers, including Lt. Phillips and Sgt. Hardway, regularly posted videos and pictures of themselves in uniform on social media.

71. On April 30, 2020, an anonymous email regarding Ms. Griffith's social media posts where she appeared in uniform was submitted to Defendant Mifflin Township's Board of Trustees by a self-identified "concerned citizen" with the email address identifier as "rjd4pve".

72. The complaint included screenshots of Ms. Griffith in uniform that were taken from videos posted on her TikTok account.

73. The anonymous complainant pointed out a recent issue of concern that came "[w]ith the advent of social media", specifically that s/he "noticed a trend", and launched into stereotyping young female police officers as follows:

> "It seems many young female Officers aren't satisfied with being an uncelebrated, quiet, mature professional. They have a thirst for attention, and they attempt to satisfy that thirst through social media."

74. The complainant then guessed that Ms. Griffith was likely with the Department for "about a year" to be "comfortable in making and posting personal videos on company time."

75. The complainant also provided Ms. Griffith's full name and TikTok handle, while likening her role in law enforcement and social media presence to "the shallow narcissistic attention-seeking behavior of teens whose only desire is to become 'internet famous.'"

76. Effective May 1, 2020, Defendant elected to place Ms. Griffith on paid administrative leave because of the anonymous complaint and TikTok videos referenced.

77. Ms. Griffith was informed of this complaint in a meeting with Lt. Phillips and Chief Price, where they told Ms. Griffith that her TikTok posts were "not the image the Trustees want" for the Department and informed her that she could either resign by May 3, 2020 or be terminated.

78. Upon reviewing the complaint, Ms. Griffith expressed to Lt. Phillips and Chief Price that the email should not be considered credible, as it contained "sexist" language and that the author obviously held negative views of women.

79. Lt. Phillips and Chief Price responded that it did not matter if the complainant was sexist or not because Ms. Griffith's TikTok posts violated the recently implemented (December 2019) "social media policy," which prohibited representing the Department in a "negative" way on the internet, essentially endorsing the complainant's sex-based stereotyping of women officers.

80. On May 5, 2020, several days short of her probationary period's expiration, Ms. Griffith was terminated.

81. In Ms. Griffith's termination letter, Defendant Mifflin Township's then-Chief Price stated that Ms. Griffith had not met the standards expected of her during her probationary period, referencing "various concerns" discussed with her by superior officers and her recent conduct in posting videos on her "personal social media page while in uniform."

82. However, Ms. Griffith had only received one documented prior formal disciplinary write-up and a verbal warning prior to her termination.

83. Defendant's asserted reasons for terminating Ms. Griffith constitute pretext for discrimination and/or retaliation because its similarly situated male probationary officers and/or probationary officers who did not engage in protected activity engaged in the same, similar, and/or worse conduct and were not so terminated.

84. These similarly situated male officers and/or those who did not engage in protected activity were treated more favorably than Ms. Griffith, including being permitted extended probationary periods, where, in contrast, Ms. Griffith was terminated for the same, similar, and/or less egregious conduct.

85. For example, male P.O. Pinney posted multiple pictures and/or videos of himself in uniform on social media, including Snapchat, Instagram, and his public dating profile on Tinder.

86. In fact, P.O. Pinney posted a "selfie" of himself in uniform while in the Department's bathroom on social media, which another officer printed out and taped to his locker door, where all officers, male and female alike, could see it.

87. P.O. Pinney was not disciplined or terminated for posting this content on social media.

88. Defendant's then-Probationary Officer Donald Thomas ("P.O. Thomas"; male), had major performance issues for which he was disciplined on multiple occasions, each of which constituted the same, similar, and/or worse conduct than Ms. Griffith allegedly was terminated for by Defendant.

89. In July 2018, Lt. Phillips gave P.O. Thomas a ninety-day extension of his probationary period in response to these multiple disciplinary actions.

90. During this extended probationary period, P.O. Thomas violated multiple policies for which he was talked to and/or disciplined, including making traffic stops without probable cause, general poor performance, including ticketing and paperwork mistakes, safety issues, and serious attendance concerns, including failing to appear for court and shifts.

91. Significantly, during this extension in October 2018, Lt. Phillips placed P.O. Thomas on a three-day suspension with pay for continued policy violations.

92. However, in November 2018, though P.O. Thomas had multiple recurring disciplinary actions and a suspension during the extended probationary period, Lt. Phillips granted him a second probationary extension through January 2019.

93. During this second extended probation period, P.O Thomas was required to complete sixty-days of the Field Training Officer program and thirty-days of "solo period" with supervisor evaluation.

94. Ultimately, after being given two probationary extensions by Lt. Phillips, P.O. Thomas was permitted to resign in good standing in lieu of termination on July 15, 2019, after multiple and repeated instances of disciplinary actions and/or conduct warranting discipline which constituted similar and/or worse conduct than Ms. Griffith's alleged conduct leading to her termination, and his continued poor performance.

95. Several similarly situated male probationary officers and/or those probationary officers who did not engage in any form of protected activity engaged in the same, similar, and/or worse conduct as Ms. Griffith and were not disciplined and/or terminated by Defendant, whereas Ms. Griffith was so terminated for pretextual reasons because of her sex and/or in retaliation for her protected activities in complaining about sex discrimination, sex stereotyping, and/or sex-discriminatory severe or pervasive harassment leading to a hostile work environment based on sex by Defendant, its male officers, and/or its superior officers.

96. As a direct and proximate result of Defendant's failure to remedy a hostile work environment based on sex after having been notified on several occasions by Ms. Griffith and declining to and/or otherwise failing to take any meaningful action intended to end the harassment, Ms. Griffith suffered and continues to suffer from emotional distress and hardship, frustration, and humiliation.

97. As a direct and proximate result of Defendant's discrimination in terminating Ms. Griffith because of her sex and/or in retaliation for her protected activity in complaining about and/or opposing sex discrimination, sex stereotyping, and/or sex-discriminatory severe or

pervasive harassment leading to a hostile work environment based on sex by Defendant, its male officers, and/or its superior officers, Ms. Griffith suffered and continues to suffer economic loss in the form of lost income, despite reasonable but unsuccessful efforts to secure comparable employment.

98. As a direct and proximate result of Defendant's discrimination in terminating Ms. Griffith because of her sex and/or in retaliation for her protected activity in complaining about and/or opposing sex discrimination, sex stereotyping, and/or sex-discriminatory severe or pervasive harassment leading to a hostile work environment based on sex by Defendant, its male officers, and/or its superior officers, Ms. Griffith suffered and continues to suffer from emotional distress, frustration, and humiliation.

99. As a direct and proximate result of Defendant's discrimination in terminating Ms. Griffith because of her sex and/or in retaliation for her protected activity in complaining about and/or opposing sex discrimination, sex stereotyping, and/or sex-discriminatory severe or pervasive harassment leading to a hostile work environment based on sex by Defendant, its male officers, and/or its superior officers, Defendant acted with conscious disregard towards Ms. Griffith's right to remain free from discrimination and retaliation, even though its conduct had a great probability of causing Ms. Griffith economic and emotional hardship and did cause such harm.

100. To date, as a direct and proximate result of Defendant's discrimination in terminating her because of her sex and/or in retaliation for her protected activity in complaining about and/or opposing sex discrimination, sex stereotyping, and/or sex-discriminatory severe or pervasive harassment leading to a hostile work environment based on sex by Defendant, its male officers, and/or its superior officers, Ms. Griffith has been unable to secure a reasonable

replacement position that compares with the compensation, overtime and special duty opportunities, and other fringe benefits afforded to her by virtue of her employment with Defendant Mifflin Township despite reasonable good faith efforts.

V. **Claims**

    A. **Count I: Violation of Title VII of Civil Rights Act of 1964**

101. Paragraphs 1 through 100 are incorporated herein as if fully set forth.

102. By failing to remedy a severe and/or pervasive hostile work environment based on sex and by terminating Plaintiff for pretextual reasons because of her sex and/or in retaliation for making complaints about and/or opposing conduct she sincerely and reasonably perceived to be sex discrimination, sex stereotyping, and/or sex-discriminatory severe or pervasive harassment leading to a hostile work environment based on sex by Defendant, its male officers, and/or its superior officers, Defendant violated Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*.

    B. **Count II: Violation of Ohio Laws Against Discrimination**

103. Paragraphs 1 through 100 are incorporated herein as if fully set forth.

104. By failing to remedy a severe and/or pervasive hostile work environment based on sex and by terminating Plaintiff because of her sex and/or in retaliation for making complaints about and/or opposing conduct she sincerely and reasonably perceived to be sex discrimination, sex stereotyping, and/or sex-discriminatory severe or pervasive harassment leading to a hostile work environment based on sex by Defendant, its male officers, and/or its superior officers, Defendant violated the Ohio Laws Against Discrimination, R.C. 4112.99.

VI. **Prayer for Relief**

WHEREFORE, Plaintiff is entitled to and prays for the following relief:

A.    a declaration that Defendant violated Title VII of the Civil Rights Act and/or the Ohio Laws Against Discrimination;

B.    equitable relief of reinstatement to her prior position with all applicable seniority and other benefits restored;

C.    wages, salary, employment benefits, and other compensation denied or lost, exceeding $75,000, because of Defendant's violations;

D.    compensatory and punitive damages in an amount exceeding $25,000;

E.    prejudgment and post-judgment interest:

F.    costs and attorneys' fees; and

G.    such other relief as the Court deems fair and equitable.

Respectfully submitted,

By: /s/ *Madeline J. Rettig*
Madeline J. Rettig (0098816)
(*mrettig@marshallforman.com*)
John S. Marshall (0015160)
(*jmarshall@marshallforman.com*)
Edward R. Forman (0076651)
(*eforman@marshallforman.com*)
Samuel M. Schlein (0092194)
(*sschlein@marshallforman.com*)
Helen M. Robinson (0097070)
(*hrobinson@marshallforman.com*)
MARSHALL & FORMAN LLC
250 Civic Center Dr., Suite 480
Columbus, Ohio 43215-5296
(614) 463-9790
Fax (614) 463-9780

**OF COUNSEL:**
Louis A. Jacobs (002101)
(*LAJOhio@aol.com*)
177 19th St., Apt. 9C
Oakland, CA 94612
(614) 203-1255
Fax (614) 463-9780

## JURY DEMAND

Plaintiff demands a trial by jury on all issues and defenses triable to a jury.

By: /s/ *Madeline J. Rettig*
Madeline J. Rettig (0098816)

19